TIMOTHY COURCHAINE
United States Attorney
District of Arizona
AMY C. CHANG
Arizona State Bar No. 027566
RAYMOND K. WOO
Arizona State Bar No. 023050
M. BRIDGET MINDER
Arizona State Bar No. 023356
Assistant United States Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone:  602-514-7500
Email: amy.chang@usdoj.gov
Email: raymond.woo@usdoj.gov
Email: bridget.minder@usdoj.gov

JOHN EISENBERG
Assistant Attorney General
National Security Division
LESLIE C. ESBROOK
New York State Bar No. 5406301
District of Columbia Bar No. 1670737
CHRISTOPHER M. COOK
District of Columbia Bar No. 90013354
Trial Attorneys
Counterintelligence and Export Control Section
950 Pennsylvania Ave, NW
Washington, DC 20530
Email: Leslie.Esbrook@usdoj.gov
Email: Christopher.Cook7@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-24-00394-PHX-SPL |
| Plaintiff, | |
| vs. | **GOVERNMENT'S RESPONSE TO DEFENDANTS' SELECTIVE PROSECUTION MOTION** |
| Abraham Chol Keech, et al. | |
| Defendants. | |

The prosecution of Abraham Keech and Peter Ajak is appropriate and warranted, not improper or selective. For months, defendants talked with Phoenix-based weapons

dealers about buying export-controlled, military-grade weapons to effect a non-democratic regime change in South Sudan. It was defendants who (among other things) put together a "shopping list" of weapons, came to Phoenix to see the weapons, and signed both a real weapons invoice and a fake "humanitarian aid" invoice to conceal their illegal purchase.

Defendants' motion (Doc. 87[1]) argues the government should also have charged other individuals and its failure to do so means their prosecution was improperly motivated. Defendants are wrong and their claims fall far short of the rigorous standard for establishing a selective prosecution claim. Here, there was no discriminatory effect because no one is "similarly situated" to defendants, who were the ringleaders of their conspiracy to illegally export weapons. Although defendants interacted with various individuals during the conspiracy—including several from whom they sought advice, money, or other assistance for the broader project of regime change and related efforts—*none* of those individuals are on par with defendants. Defendants' conclusory and self-serving statements about others' alleged similarity are unsupported by credible evidence and do not account for the significant differences among and between them.

Defendants' selective prosecution claim also fails because they present zero evidence, much less "clear evidence," of any discriminatory purpose. Instead, defendants argue that because there was an alleged discriminatory effect, this Court should infer a discriminatory purpose. This circular argument improperly merges the two distinct prongs of the well-established test for selective prosecution. The Supreme Court and the Ninth Circuit have consistently required defendants to show credible evidence of *both* a discriminatory purpose *and* a discriminatory effect to succeed on a selective prosecution claim or obtain discovery regarding such a claim. Defendants do not even attempt to make such a showing here, nor can they. The government's charging decision was consistent with the principles of federal prosecution and was not motivated by any improper purpose.

Defendants' motion to dismiss and request for discovery should be denied.

---

[1] Defendant Ajak filed his Motion on May 29, 2025, and defendant Keech joined on June 12, 2025. (Docs. 87, 96.)

**FACTUAL BACKGROUND**

In February 2023, undercover agents from the Department of Defense ("UC-1") and Homeland Security Investigations ("UC-2") (collectively, the "UCs")—who were posing as Arizona-based arms dealers—began communicating with defendant Abraham Keech about his efforts to procure weapons in support of a movement to overthrow the current government of South Sudan. (*See* Complaint, Doc. 3 ¶ 34.) In April 2023, Keech traveled to Phoenix to meet with the UCs in person. During the meeting, Keech inspected samples of AK-47 assault rifles, PKM machine guns, PSL sniper rifles, and RPG grenade launchers. Keech agreed to provide the UCs with a detailed list of weapons and ammunition that he wanted to buy. Keech also suggested to the UCs that they could smuggle the weapons through a U.S. military base in another African country to avoid search by that country's government. Keech told the UCs that only the first few shipments would be "dealing with illegal business," intimating that once he overthrew the South Sudanese government, the sanctions barring U.S. shipments to South Sudan would be lifted. (Doc. 3 ¶ 39(b).)

On October 16, 2023, Keech told UC-1 during an encrypted call that a person in Washington, D.C., named "Peter"—who was not a government official but was well connected—was not initially convinced that violence was the proper approach but had since changed his mind. Keech told UC-1 that Peter knew Keech had met with the UCs to see the weapons, and that Peter planned to meet with financiers about funding. (Doc. 3 ¶ 39(e).)

On November 3, 2023, Keech introduced defendant Peter Ajak to UC-1 on an encrypted call as his partner who was helping obtain weapons for South Sudan. Defendants told UC-1 that their potential suppliers could not supply all the weapons they needed and that they were looking to UC-1 to supply the remaining weapons. UC-1 explained it would be violation of U.S. law to export the weapons. Ajak said he was aware of the sanctions and understood the risk, and that they would therefore be discreet in their conversations with others. (Doc. 3 ¶¶ 40-41.)

On November 8, 2023, Ajak explained during a videoconference with the UCs that he was looking to foment "basically a coup … with both internal and external fronts" against the current South Sudanese government. Ajak told UC-1 he wanted to "knock it over and rebuild a new country," and that he would be installed as the new "Prime Minister" and "head of the government." Ajak added he needed anti-tank weapons to disable the thirteen to fifteen functioning tanks in South Sudan, and asked about obtaining anti-aircraft systems to disable the South Sudanese military's helicopters. UC-1 reminded defendants that current sanctions prohibited the sale of weapons to South Sudan and that their proposal was illegal. Ajak told UC-1 that the sanctions would be "lifted immediately" after the regime change. Keech similarly reassured the UCs, saying "[t]his issue of sanctions, don't worry about it." Ajak further offered to execute a Memorandum of Understanding that would make the UCs' company the official arms supplier to South Sudan after the regime change. (Doc. 3 ¶¶ 42-43.)

From November 2023 to February 2024, Keech and Ajak continued to communicate regularly with the UCs. Over that time, defendants had dozens of encrypted calls and exchanged hundreds of text messages with the UCs, together and separately, regarding the details of the weapons purchase, including quantities, product types, and payment schedules. (Doc. 3 ¶¶ 44-68.) For example, on December 22, 2023, Ajak told UC-1 on a recorded call that defendants would send UC-1 a new "shopping list" of items needed for their coup. Later that day, Keech sent UC-1 a photo of a hand-written list of weapons for purchase:

13/12/2023

**Immediate Consignment for Operation free South Sudan**

| | Item | Quantity | Unit Price | Total |
|---|---|---|---|---|
| 1. | AK 47 Rifles | 1,000 | $200.00 | $200,000.00 |
| 2. | PKM Rifles | 100 | $675.00 | $67,500.00 |
| 3. | RPG-7 | 100 | $575.00 | $57,500.00 |
| 4. | AK47 Ammos | 1,000,000 | $0.17 | $170,000.00 |
| 5. | PKM Ammos | 500,000 | $0.21 | $105,000.00 |
| 6. | RPG-Ammos (Regular) | 500 | $80.50 | $40,250.00 |
| 7. | RPG-Ammos (Antitank) | 100 | $600.00 | $60,000.00 |
| 8. | Sniper Rifles | 70 | $1,092.50 | $76,475.00 |
| 9. | Stinger | 3 | $80,000.00 | $240,000.00 |
| 10. | Thuraya phones | 20 | $1,200.00 | $24,000.00 |
| 11 | Walkie-Talkies | 50 | $500.00 | $25,000.00 |
| | Sub-Total | | | $1,065,725.00 |
| | Transportation (from AZ to South Sudan) 20%: | | | $213,145.00 |
| | Direct Cash Support | | | $100,000.00 |
| | Grand Total: | | | $1,378,870.00 |

On January 25, 2024, Ajak also asked UC-1 to procure a helmet, bulletproof vest, and rifle for his own personal use, noting he was "obviously going to be leading this mission" and needed "something really dependable and something that is easy and something that is pretty bad ass." During the call, Ajak also told UC-1 that while several military generals remained involved in his plan, Ajak was the ultimate decision-maker on the purchase. (Doc. 3 ¶¶ 55-56.)

On February 22, 2024, Keech and Ajak met with the UCs at their Phoenix warehouse. The UCs showed defendants samples of assault rifles, machine guns, grenade

launchers, sniper rifles, Stinger missiles, and other items. Defendants personally handled and inspected the weapons, as shown in the photos below (Ajak, top; Keech, bottom):





Ajak also tried on the bulletproof vest and helmet, stating, "I've gotta be leading from the front, not the back." (Doc. 3 ¶ 69.) During the meeting, Ajak signed and initialed copies of both (1) an invoice to purchase weapons and ammunition totaling close to $4 million, and (2) a "fake" invoice for the same purchase amount for purported humanitarian consulting services and related items. (Doc. 3 ¶¶ 67, 72.) During the meeting, UC-1 again reiterated that there were sanctions preventing the transfer of weapons from the United States to South Sudan, and that licenses would be required to ship the weapons legally (licenses that defendants did not have). Ajak acknowledged that there were sanctions in place. (Doc. 3 ¶ 72.)

On February 29, 2024, the United States charged Keech and Ajak by criminal Complaint with various export violations related to the weapons procurement and export scheme. (Doc. 3.) Defendants were arrested the following day. Less than a week later, a Phoenix grand jury returned an indictment on the same charges. (Doc. 14.) A superseding indictment was returned on April 30, 2025. (Doc. 71.) Defendants are charged with Conspiracy to Violate the Arms Export Control Act and the International Traffic in Arms Regulations (in violation of 18 U.S.C. § 371); Conspiracy to Violate the Export Control Reform Act and the Export Administration Regulations (in violation of 50 U.S.C. §§ 4819(a)(1), (a)(2)(D), and 4819(b); and 15 C.F.R. §§ 736.2(b)(1) and 774, Supp. No. 1); Smuggling of Goods from the United States (in violation of 18 U.S.C. § 554(a)); and Conspiracy to Export Missile Systems Designed to Destroy Aircraft (in violation of 18 U.S.C. §§ 2332g(a)(1), (b)(1), and (c)(1)). Trial is set to begin on September 23, 2025.

## LEGAL STANDARD

The Supreme Court has recognized that the "[g]overnment retains broad discretion as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985).[2] So long as the prosecutor has "probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring

---

[2] Unless otherwise noted, all internal quotation marks and citations are omitted.

- 7 -

before a grand jury, generally rests entirely in his discretion." *Id.* This broad discretion rests "largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review," because factors such as "the strength of the case, the prosecution's general deterrence value, the [g]overnment's enforcement priorities, and the case's relationship to the [g]overnment's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Id.*; *see also United States v. Rundo*, 108 F.4th 792, 803 (9th Cir. 2024) (same).

With those considerations in mind, the Supreme Court has articulated a "presumption of regularity" that attaches to prosecutorial charging decisions. *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996). In other words, "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their duties." *Id*. Although a selective prosecution claim provides a narrow exception to the "presumption of regularity," the presumption afforded to prosecutors may only be overcome by "clear evidence" of improper government conduct, *e.g.*, charging decisions based on "race, religion, or other arbitrary classification."[3] *Id.* This standard is "particularly demanding." *Rundo*, 108 F.4th at 798. More than that, however, courts should adhere to the basic principle that they "not unnecessarily impair the [prosecutor's] performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 465.

To succeed on a selective prosecution claim, a defendant must show clear evidence of both discriminatory effect *and* discriminatory purpose. *Rundo*, 108 F.4th at 798-99. Conclusory allegations will not suffice; rather, a defendant's evidence must be "credible" and cannot rest on mere "personal conclusions based on anecdotal evidence." *Armstrong*,

---

[3] As an initial matter, defendants cite no legal precedent for the assertion that being of different "political and socio-economic importance" constitutes a protected class under the Fifth Amendment. (Doc. 87 at 12.) Courts have consistently expressed skepticism that political and economic differences constitute protected classes for equal protection purposes. *Cf. Mendoza v. Strickler*, 51 F.4th 346, 358 (9th Cir. 2022) (holding that "the Supreme Court and this court have repeatedly affirmed the general rule that wealth discrimination alone does not trigger heightened scrutiny"); *N.A.A.C.P. v. Jones*, 131 F.3d 1317, 1321 (9th Cir. 1997) ("Wealth is not a suspect category in Equal Protection jurisprudence."); *Houston v. Sacramento Co. Sheriff's Dep't*, No. 2:20-cv-2085 WBS, 2021 WL 916186, at *3 (E.D. Cal. Mar. 10, 2023) ("Social status is not a protected class.").

517 U.S. at 470. When evaluating both prongs of the selective prosecution test, evidence is viewed "in the light most favorable to the government." *Rundo*, 108 F.4th at 799.

To satisfy the discriminatory effect prong, a defendant must demonstrate that "other similarly situated individuals have not been prosecuted." *Id.* at 799. A defendant "must show that the comparator is the same as the defendant *in all relevant respects*" except for the discriminatory characteristic. *Id.* at 801 (emphasis added). The factors that make charging decisions ill-suited to judicial review, such as the "strength of the case, the prosecution's general deterrence value, the [g]overnment's enforcement priorities, and the case's relationship to the [g]overnment's overall enforcement plan," are the same factors that defeat a claim for discriminatory prosecutorial effect. *Id.* at 803.

To satisfy the discriminatory purpose prong, a defendant must demonstrate that the government has brought its case "at least in part *because* of, not merely in spite of, its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610; *see Rundo*, 108 F.4th at 804-05. "Mere selectivity in prosecution creates no constitutional problem." *Rundo*, 108 F.4th at 805.

A defendant may request discovery in support of a selective prosecution claim, but there, too, the necessary showing is substantial. The Supreme Court has recognized that the showing necessary to obtain discovery should be as "correspondingly rigorous" as that for proving the claim itself, and serve as a "significant barrier to the litigation of insubstantial claims." *Armstrong*, 517 U.S. at 464, 468. A defendant seeking discovery on a selective prosecution claim must therefore "show *some evidence* of both discriminatory effect and discriminatory intent." *United States v. Wilson*, 123 F.4th 1021, 1027 (9th Cir. 2024) (emphasis added).

## ARGUMENT

Over the course of many months, defendants coordinated with each other and the UCs to procure, purchase, and export military-grade weapons from the United States to South Sudan, without first obtaining the required licenses. They engaged in dozens of recorded phone calls, traveled to Phoenix for in-person meetings and weapons inspections,

signed and approved invoices (both real and fake), and exchanged hundreds of text messages regarding the scheme. They were prosecuted because of their serious criminal conduct—not because of their race, social or economic status, or any other reason. Defendants' unsupported claims to the contrary fail to satisfy the "clear evidence" standard required to establish discriminatory effect or discriminatory purpose.

### A. The prosecution has not resulted in any discriminatory effect.

Defendants cannot show—by "clear evidence" or otherwise—that there are any similarly situated individuals who have unfairly avoided prosecution. Defendants are uniquely culpable for the charged conduct. It was defendants who interacted directly with the UCs over the course of many months, spending countless hours on recorded phone calls discussing weapons systems, available quantities, delivery options, and pricing and payment structures. It was defendants who put together the "shopping list," adding and subtracting items until they were happy with the final purchase order. And it was defendants who traveled to Phoenix to meet with the UCs in person, inspect the weapons, and sign the weapons invoice and the fake humanitarian consulting invoice.

In contrast, none of the four comparators identified in defendants' motion is similarly situated. None of these individuals participated in recorded telephone calls or text messages with the UCs, traveled to Phoenix for in-person meetings, handled the weapons, or had any contact with the UCs at all. This marked difference in the nature and extent of the conduct alone provides a sufficient basis to defeat a claim of discriminatory effect.

The Ninth Circuit's recent decision in *Rundo* is instructive. There, defendants—who were founding members of a white supremacist militant group and violently attacked counter-protestors at various political rallies—claimed they were unfairly charged with violating the Anti-Riot Act when members of "far-left-wing" groups at the same rallies were not. The Ninth Circuit, however, disagreed. In concluding defendants were not similarly situated to the comparators, the Court observed that unlike comparators (who attended only one rally), defendants engaged in violent behavior at numerous rallies over the course of several months. *See Rundo*, 108 F.4th at 801-03. In addition, unlike

comparators, the defendants "clearly had a leadership role in [the militant group]," and were responsible for coordinating training sessions, creating recruitment materials, and planning cross-country travel to commit the crimes. *Id.*

These factors similarly distinguish defendants in this case from their purported comparators. As noted above, defendants (but not the comparators) communicated for months with the UCs to illegally procure and export weapons, an effort that included coordinating international shipments, creating a fake paper trail, and traveling cross-country to commit the crimes. And as in *Rundo*, defendants "clearly had a leadership role" in organizing and executing the weapons export scheme. Indeed, although defendants interacted with other individuals during the course of the conspiracy (including others not listed as comparators in defendants' motion),[4] defendants were the central (and only) connective tissue between their broader project of regime change and the charged offenses. As detailed above, Ajak told the UCs he would be South Sudan's next "Prime Minister" and "head of the government"; was the ultimate decision-maker on the weapons purchase; and needed a "bad ass" weapon so he could lead the mission from the front. Keech, for his part, had been in contact with the UCs for over a year and told the UCs he came to the United States specifically to meet with them and broker the weapons purchase. Defendants' central leadership roles in the export conspiracy therefore provide a "facially neutral explanation [for charging defendants] that the judiciary is not well-equipped to second-guess." *Rundo*, 108 F.4th at 803.

The relative strength of the government's evidence is another distinguishing factor between defendants and the comparators. In assessing whether the defendants and comparators were similarly situated, the Ninth Circuit in *Rundo* observed that the "strongest point in the government's favor [was] the strength of the evidence against

---

[4] Other individuals, including those identified in the Complaint as Person-1, Person-2, and Person-6, moved in and out of defendants' weapons export conspiracy at various times. Notably, defendants do not raise a selective prosecution claim regarding the government's decision not to charge these individuals—all of whom, like defendants, are originally from South Sudan—presumably because doing so would not further the defendants' selective prosecution claim.

[d]efendants versus that against [the comparators]." In particular, the Court found compelling that the government's evidence against the defendants included their own online statements bragging about their violent exploits at various rallies. *Id.* at 803-04.

The strength of the government's evidence against defendants here—including evidence regarding the willfulness of their conduct—similarly distinguishes them from their purported comparators. On numerous recorded calls and during in-person meetings, defendants acknowledged the existence of the sanctions and licensing requirements, and their knowledge of the scheme's illegality. The relative strength of the evidence against defendants (in particular, as to defendants' required mental state) further rebuts defendants' claim that the comparators are the "same as the defendant[s] *in all relevant respects*." *Rundo*, 108 F.4th at 798, 803-804 (rejecting selective prosecution claim when the government had "ample evidence of [defendants'] unlawful conduct," including defendants' own statements) (emphasis added); *Armstrong*, 517 U.S. at 460 (denying defendants' request for discovery regarding selective prosecution when government's "evidence in the case was extremely strong, including audio and videotapes of defendants").

Defendants' repeated and extended contact with the UCs, leadership roles in the weapons export scheme, and the strength of the evidence against them make clear that they are uniquely culpable for the charged conduct. Tellingly, defendants fail to identify *any* credible evidence to the contrary. Despite the voluminous discovery produced in this case, defendants do not cite any evidence to support their assertion that the alleged comparators are similarly situated to defendants with respect to the weapons export scheme. Instead, they rely solely on their own conclusory, self-serving assessments regarding the comparators' alleged contributions to the broader project of regime change. The Ninth Circuit and other courts have recognized, however, that mere "personal conclusions based on anecdotal evidence" cannot be a basis for a selective prosecution claim. *Rundo*, 108 F.4th at 800 n.7 (quoting *Armstrong*, 517 U.S. at 470)); *see also United States v. Biden*, 728 F. Supp. 3d 1054, 1084 (C.D. Cal. 2024) (denying motion to dismiss for selective

prosecution or discovery when defendant failed to provide any evidence to support his claims and instead relied only on "Internet news sources, social media posts, and legal blogs").

In the absence of any credible evidence regarding discriminatory effect, defendants have failed to rebut the "presumption of regularity" that attaches to prosecutorial charging decisions. The government has a strong interest in preventing the unlawful export of sensitive U.S. military and dual use technology. Prioritizing the prosecution of the individuals most directly and heavily involved in that unlawful activity is a legitimate government enforcement priority with clear deterrence value. *See Wayte*, 470 U.S. at 607 (acknowledging that the government's enforcement priorities and the prosecution's general deterrence value are not readily susceptible to judicial evaluation). Because defendants have failed to establish by clear evidence that other individuals are similarly situated but have unfairly avoided prosecution, their motion should be denied.

### B. The prosecution was not pursued because of a discriminatory purpose.

Defendants have also failed to present any evidence, let alone "clear evidence," of discriminatory purpose. As the Ninth Circuit has held, "[m]ere selectivity in prosecution creates no constitutional problem," *Rundo*, 108 F.4th at 805, and defendants must demonstrate the government has brought its case at least in part "*because* of, not merely in spite of, its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610.

Defendants do not attempt to make such a showing here. Instead, they impermissibly ask the Court to *infer* a discriminatory purpose based on their (unsupported) arguments regarding discriminatory effect. (Doc. 87 at 12.[5]) As explained above, however,

---

[5] Defendants claim that *Wilson*, 123 F 4th. at 1027, supports the notion that the Court may infer a discriminatory purpose from nothing more than allegations of discriminatory effect. Such a conclusion misreads *Wilson* entirely. In *Wilson*, the Ninth Circuit rejected the defendants' claims regarding discriminatory effect, finding that the defendants and comparators were not similarly situated in all relevant respects. Because the defendants failed to satisfy the first prong of the selective prosecution test, the Ninth Circuit declined to even address the defendants' arguments regarding discriminatory purpose. Defendants' argument here that the Court may collapse the two prongs of the selective prosecution test therefore finds no support in *Wilson*.

discriminatory purpose and discriminatory effect are distinct requirements for a selective prosecution claim—defendants cannot simply merge the two prongs to avoid the required showing of discriminatory purpose.

The Ninth Circuit has explicitly rejected defendants' approach. In *Rundo*, the district court found discriminatory purpose based in part on the fact the government "did not prosecute far-left activists who were also responsible for violence at political rallies." 108 F.4th at 805. The Ninth Circuit reversed, holding the district court had improperly "collapsed the two prongs of the selective prosecution analysis." *Id*. The Court further found unpersuasive the defendants' circumstantial evidence of discriminatory purpose—which consisted of "statistics," Department of Justice press releases, and changes in DOJ enforcement priorities. The Court concluded that notwithstanding this information, the district court "could only guess that [defendant] was prosecuted *because of* his speech." *Id.* at 808. Because such a guess was "insufficient to rebut the presumption of regularity," the Court reversed the district court's dismissal order and reinstated the indictment. *Id.*; *see also Biden*, 728 F. Supp. 3d at 1092-93 (finding defendant failed to establish discriminatory purpose when he offered "only conjecture about animus motivating the prosecutorial decisions in this case" but no facts to support his "thin" circumstantial allegations); *United States v. Klimenka*, 22-CR-00256-SI-1, 2025 WL 1635672, at *3 (N.D. Cal. June 9, 2025) (denying defendant's motion to dismiss when defendant failed to "introduce[] any evidence of impermissible motive").

This Court should similarly reject defendants' circular arguments here. As explained above, defendants have provided *no evidence* of discriminatory effect—they cannot satisfy the discriminatory purpose requirement by inartfully bootstrapping their arguments regarding purpose to their already tenuous claims regarding effect. The Supreme Court has cautioned that courts should be "properly hesitant" when examining the executive branch's decisions about whether and whom to prosecute, as doing so "delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decision[-]making to outside inquiry, and may undermine prosecutorial effectiveness by

revealing the [g]overnment's enforcement policy." *Wayte*, 470 U.S. at 607-08. Given the complete absence of any evidence of discriminatory purpose, the Court should decline to undertake such an examination here.

### C. Defendants are not entitled to discovery or an evidentiary hearing.

Defendants' request for discovery or an evidentiary hearing should also be denied.[6] For the reasons explained above, defendants have failed to show any evidence of discriminatory effect or purpose. As defendants recognize (*see* Doc. 87 at 13), the standard to obtain discovery related to prosecutorial intent is a substantial bar, and purposefully serves as a "significant barrier to the litigation of insubstantial claims." *Armstrong*, 517 U.S. at 464; *Wilson*, 123 F.4th at 1027. Requiring the government to produce internal memoranda, emails, and work product, national security materials, or communications with other government agencies far exceeds the bounds of traditional discovery. Such a request should be carefully scrutinized lest it "unnecessarily impair" the prosecutor's performance of a "core executive constitutional function." *Armstrong*, 517 U.S. at 465.

Defendants have failed to satisfy the "rigorous" showing required for an order of discovery.[7] *Armstrong*, 517 U.S. at 464. Absent "some evidence" of selective prosecution, defendants' requests for discovery and an evidentiary hearing should be denied. *Wilson*, 123 F.4th at 1027; *United States v. Turner*, 104 F.3d 1180, 1185 (9th Cir. 1996) (reversing

---

[6] Defendants request an evidentiary hearing in their Motion's caption but make no arguments in support of their request. Their request should be denied, as they have failed to establish even a prima facie case. *See United States v. Bourgeois*, 964 F.2d 935, 938 n.1 (9th Cir. 1992); *Pedrin v. United States*, No. CV-17-00219-TUC-CKJ, 2019 WL 1469259, at *10, 12 (D. Ariz. Apr. 3, 2019) (denying defendant's request for an evidentiary hearing on selective prosecution claim in post-conviction proceeding when defendant provided no evidence the government acted with discriminatory purpose).

[7] Defendants rely on two out-of-circuit cases, both of which are decades old, relate to crack cocaine prosecutions, and are factually inapposite. In *United States v. Jones*, 159 F.3d 969 (6th Cir. 1998), for example, defendant presented evidence that arresting officers printed t-shirts with the faces of defendant and his co-defendant (both of whom are African American), and later sent defendant a postcard depicting a black woman with a basket of bananas on her head. In ordering discovery, the Sixth Circuit found defendant had presented sufficient evidence of selective prosecution, based on the "egregious" and "taunting" actions of investigators. *Jones*, 159 F.3d 975-78. Here, none of defendants' allegations come anywhere close to the level of misconduct present in *Jones*.

district court's order granting discovery when defendants "offered no evidence whatsoever of an intent on the part of the prosecutors to prosecute them on account of their race" and failed to rebut the presumption that prosecutors were "properly discharging their duties").

## CONCLUSION

Defendants have offered no credible evidence that they were subject to selective prosecution or are otherwise entitled to discovery. Defendants have been charged with violating U.S. export laws because of what they did, not who they are. Their direct, extensive, and recorded communications with the UCs, their leadership role in the conspiracy to procure and export weapons, and the government's interest in prioritizing the prosecution of individuals engaged in the unlawful export of military-grade weapons, all provide facially neutral reasons for their prosecution. Because they have failed to provide clear evidence to the contrary, their motion to dismiss and request for discovery should be denied.

Respectfully submitted this 2nd day of July, 2025.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

*s/Amy C. Chang*
AMY C. CHANG
RAYMOND K. WOO
M. BRIDGET MINDER
Assistant U.S. Attorneys

LESLIE C. ESBROOK
CHRISTOPHER M. COOK
Trial Attorneys, National Security Division

**CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrants:

Richard C. Bock and Dominic Rizzi, *Attorneys for Abraham Keech*
Kurt Altman, *Attorney for Peter Ajak*

*s/Alexandria Gaulin*
U.S. Attorney's Office