**Altman**
LAW & POLICY

**KURT M. ALTMAN, P.L.C**.
Kurt M. Altman (015603)
12621 N. Tatum Blvd., #102
Phoenix, AZ 85032
Admin@altmanaz.com
Phone: (602) 689-5100
*Attorney for Defendant*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| United States of America, | CR-24-00394-PHX-SPL-2 |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT AJAK'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR SELECTIVE PROSECUTION IN VIOLATION OF THE EQUAL PROTECTION COMPONENT OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT; OR IN THE ALTERNATIVE, DEFENDANT AJAK'S MOTION FOR DISCOVERY AS TO PROSECTORIAL INTENT** |
| Peter Biar Ajak, | |
| Defendant. | |
| | (Oral Argument and Evidentiary Hearing Requested) |

Peter Biar Ajak, by and through undersigned counsel, hereby files this Motion to Dismiss the Superseding Indictment for Selective Prosecution in Violation of the Equal Protection Component of the Due Process Clause of the Fifth Amendment, or in the alternative, Motion for Discovery as to Prosecutorial Intent.

This Motion and its requested relief is supported by the attached Memorandum of Points and Authorities.

Excludable delay under 18 U.S.C. § 3161(h)(1)(D) may result from this motion.

RESPECTFULLY SUBMITTED this 29th day of May 2025.

**KURT M. ALTMAN, P.L.C.**

*/s/ Kurt M. Altman*
Kurt M. Altman
*Attorney for Defendant*

I hereby certify that on the 29th day of May 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Honorable Steven P. Logan
United States District Court Judge
logan_chambers@azd.uscourts.gov

Amy Chang
Assistant United States Attorney
Amy.Chang@usdoj.gov

Raymond Woo
Assistant United States Attorney
Raymond.Woo@usdoj.gov

M. Bridget Minder
Assistant United States Attorney
Bridget.Minder@usdoj.gov

Richard C. Bock
lingemanbock@qwestoffice.net

Dominic James Rizzi
Rizzilawaz@gmail.com
Attorneys for Defendant Keech

By: */s/ Kurt M. Altman*

KURT M. ALTMAN, P.L.C.
12621 N TATUM BLVD., #102
PHOENIX, AZ 85032
(602) 689-5100

# MEMORANDUM OF POINTS AND AUTHORITIES

I. **PROCEDURAL BACKGROUND:**

On March 1, 2024, Mr. Ajak (and his co-defendant, Mr. Abraham Chol Keech) were arrested by agents of the Department of Homeland Security while visiting Phoenix, Arizona. The arrest was based on a federal criminal complaint signed by United States Magistrate Judge Michael T. Morrissey on February 29, 2024. The complaint included three violations of United States criminal code. Count One alleged a violation of 22 U.S.C. §§ 2778(b)(2), (c), Conspiracy to Violate the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR); Count Two alleged a violation of 50 U.S.C. §§ 4819(a)(1), 4819(a)(2)(D), and 4819(b), Conspiracy to Violate the Export Control Reform Act (ECRA) and the Export Administration Regulations (EAR); and Count Three alleged a violation of 18 U.S.C. § 544(a), Smuggling of Goods from the United States.

Mr. Ajak had his initial appearance on March 4, 2024, before United States Magistrate Judge Deborah M. Fine, and she set a Detention Hearing for March 8, 2024. After filing of the Indictment (ECF No. 14) on March 6, 2024, which alleged identical allegations as the criminal complaint, an Arraignment and Detention Hearing were held on March 15, 2024, before United States Magistrate Judge Eileen S. Willett.

On April 30, 2025, the Grand Jury issued a Superseding Indictment against Mr. Ajak and his co-defendant, again charging them with four violations of Federal law: Count 1, Conspiracy, in violation of 18 U.S.C. § 371; Count 2, Conspiracy to Violate the Export Control Reform Act (ECRA) and the Export Administration Regulations (EAR), in violation of 50 U.S.C. §§ 4819(a)(1), 4819(a)(2)(D), and 4819(b); Count 3, Smuggling of Goods from the United States, in violation of 18 U.S.C. § 554(a); and Count 4, Conspiracy to Export Missile Systems designed to Destroy Aircraft, in

violation of 18 U.S.C. §§ 2332g(a)(1), 2332(b)(1), and 2332g(c)(1). Both defendants were arraigned on May 7, 2025.

## II.   INTRODUCTION:

Paragraphs 2 through 4 of the Superseding Indictment summarize the government's factual allegations in this case. Essentially, they claim that Mr. Ajak and his co-defendant Abraham Keech conspired together and with others to obtain a military cache of weapons to be used in a coup attempt in South Sudan. According to the government, the conspiracy began in approximately February 2023. Mr. Ajak entered that conspiracy sometime in the fall of 2023, around October or November. It is obvious from the Superseding Indictment that others "known and unknown" to the government were involved in the conspiracy. Yet, only Mr. Ajak and Mr. Keech have been charged with violations of federal law arising out of the alleged conspiracy.

## III.   LAW AND ARGUMENT:

A prosecutor's discretion to make prosecutorial decisions is given great latitude by the courts but is not beyond review. That discretion is "subject to constitutional constraints." *United States v. Batchelder,* 442 U.S. 114, 125 (1979). "One of these constraints, imposed by the Due Process Clause of the Fifth Amendment, *Bolling v. Sharpe,* 347 U.S. 497, 500 (1954), is that the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *see also Untied States v. Rundo,* 108 F.4th 792, 798 (9th Cir. 2024). "A defendant may demonstrate that the administration of a criminal law is 'directed so exclusively against a particular class of persons . . . with mind so unequal and oppressive' that the system of prosecution amounts to 'practical denial' of equal protection of the law." *Armstrong*, 517 U.S at 464; *citing Yick Wo v. Hopkins,* 118 U.S. 356, 373 (1886).

4

To obtain a dismissal of a prosecution based on violation of the Due Process Clause of the Fifth Amendment, the defendant must establish two things by "clear evidence." *Armstrong*, 517 U.S at 464. First, the decision to prosecute "had a discriminatory effect and, [second,] that it was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465.

The allegations in this case can be simply summarized: According to the evidence the government intends to present, Mr. Ajak and Mr. Keech were involved in a conspiracy to obtain significant amounts of money from unindicted co-conspirators and use that money to purchase military grade weapons to be used (if necessary) to support the installation of a new democratic government in South Sudan. To obtain the desired military equipment, the defendants would have to obtain the money for the purchase. To obtain the money, defendants would have to enlist others, with political, legal, and financial connections beyond their own and large enough to assist in the lofty endeavor. Those enlisted others would be required to know the purpose of the money and the ultimate intent of the defendants and have the desire to assist in the installation of a new South Sudanese government. In short, the enlisted others would have to be knowing co-conspirators to the alleged crimes, subject to the same criminal charges the defendants now face. There are numerous individuals related to this case that fit this category, yet only Mr. Ajak and Mr. Keech have been charged with federal crimes related to these activities. This Motion focuses on four unindicted co-conspirators.

**1. GARRY KIMOVICH KASPAROV:**

Mr. Kasparov is a Russian chess grandmaster, former World Chess Champion (1985–2000), political activist, and writer. His peak FIDE chess rating of 2851, achieved in 1999, was the highest recorded until he was surpassed by Magnus Carlsen in 2013. From 1984 until his retirement from regular competitive chess in 2005, Mr. Kasparov was ranked the world's number one player for a

5

record 255 months overall. Mr. Kasparov also holds records for the most consecutive professional tournament victories (15) and Chess Oscars (11).

Since retiring from chess, Mr. Kasparov has devoted his time to writing and politics. His book series *My Great Predecessors*, first published in 2003, details the history and games of the world champion chess players who preceded him. He formed the United Civil Front movement and was a member of The Other Russia, a coalition opposing the administration and policies of Vladimir Putin. In 2008, he announced an intention to run as a candidate in that year's Russian presidential race, but after encountering logistical problems in his campaign, for which he blamed "official obstruction", he withdrew. Following the Russian mass protests that began in 2011, he announced in June 2013 that he had left Russia for the immediate future out of fear of persecution. Following his flight from Russia, he lived in New York City with his family. In 2014, he obtained Croatian citizenship and has maintained a residence in Podstrana near Split. Mr. Kasparov was chairman of the Human Rights Foundation from 2011 to 2024. And in 2017, he founded the Renew Democracy Initiative (RDI), an American political organization promoting and defending liberal democracy in the U.S. and abroad. He continues to serve as chairman of the group. *See* https://en.wikipedia.org/wiki/Garry_Kasparov.

As briefly discussed above, Mr. Kasparov is a Russian political dissident, with knowledge and connections important to the United States government. Mr. Kasparov was essential to the alleged plan to install a new government in South Sudan. He met with Mr. Ajak and others, on numerous occasions, working to secure sources of funding for the weapons. He was integrally aware of the alleged plan and was even provided details through a power point presentation shown in the New York City offices of the Paul Hastings law firm. Mr. Kasparov used his position with the Human Rights Foundation to conceal the true purpose of the money that *he* acquired from the funder *he*

6

personally recruited. He also used his political clout to set up meetings that others could not. The alleged conspiracy was impossible without the participation of Mr. Kasparov. Yet, Mr. Kasparov's history and background make him an essential political ally of the United States government, as he possesses important connections and knowledge of Russian political affairs. He is often a featured speaker at high level political gatherings and provides commentary and expertise on national television and publications. An indictment of Mr. Kasparov would have far-reaching ramifications to United States foreign policy. Importantly, unlike defendants, Mr. Kasparov is not black.

2. 

At the request and urging of Garry Kasparov and the legal assistance of Renata Parras, ▇▇ agreed to finance the plan to purchase military grade weapons to aid in the installation of a democratic government in South Sudan. ▇▇▇▇▇ had knowledge of the plan. He had the

willingness and ability to provide the financing for the plan and he agreed to do so. Without the significant financing that ▮▮▮▮▮▮ could and agreed to provide, the alleged conspiracy would have been impossible. ▮▮▮▮▮▮ was *vital* to the plan. Although an essential part of the alleged conspiracy, ▮▮▮▮▮▮ is also unindicted. Notably, as described above, he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, making an indictment against him in this matter potentially devastating to Wall Street and capital markets worldwide. Additionally, unlike defendants, ▮▮▮▮▮▮ is not black.

3. **RENATA PARRAS:**

In addition to leading Our Rescue's legal team, Ms. Parras works to create strategic partnerships with non-governmental organizations (NGOs), technology companies, law enforcement groups, and financial institutions. She brings over 15 years of expertise advising on human rights, human trafficking, social impact, and strategic partnerships across public and private sectors. Previously, Ms. Parras served as Environment, Social and Governance (ESG) and Pro Bono Counsel at Paul Hastings LLP, leading the global law firm's Modern Slavery and Human Rights Initiative. She also spent 12 years with the Department of Homeland Security as Deputy Chief Counsel, advising on immigration, human rights, and national security law. *See* https://ourrescue.org/people/renata-parras. Importantly, during all times relevant to the present case, Ms. Parras was Mr. Ajak's human rights attorney, advising him on various issues including his family's asylum and other issues relating to South Sudan.

Ms. Parras was a long-time, high-level employee of the Department of Homeland Security—the same government agency that is the lead investigative agency in this matter. She is still politically connected and important to the United States government. Ms. Parras engaged in an extraordinary

KURT M. ALTMAN, P.L.C.
12621 N TATUM BLVD., #102
PHOENIX, AZ 85032
(602) 689-5100

amount of unprivileged conduct linking her intimately to the alleged conspiracy in this matter. Ms. Parras arranged, scheduled, attended, and coordinated activities at numerous in-person planning meetings of the alleged co-conspirators. Those meetings were conducted with Paul Hastings resources and included not only herself but other unindicted co-conspirators including Garry Kasparov, ▮▮▮▮▮, Michael Holtzman and others. During those meetings, every aspect of the alleged conspiracy was discussed—*Who could provide financing and how to get it. What type of weapons may be needed and where they could be purchased. What equipment was needed on the ground in South Sudan and how to get it there. What personnel were required both here in the United States and in the South Sudan to make the transition successful.*

Ms. Parras reviewed a PowerPoint presentation that laid out the plan for installation of a new government in South Sudan and made suggestions and advised of possible pitfalls and ramifications about that plan. Ms. Parras drafted the contract, termed "Donation Agreement," that was used to transfer the money provided by ▮▮▮▮▮ for use in the alleged conspiracy. Her internet research history shows she conducted searches for "coup" in a foreign land and researched the potential legal ramifications of such in the United States. The alleged conspiracy was *impossible* without her significant contributions. Ms. Parras was essential to the alleged conspiracy and to date remains unindicted. Finally, unlike defendants, Ms. Parras is not black.

**4. MICHAEL HOLTZMAN:**

Mr. Holtzman describes himself as follows:

> A highly creative and effective communications leader who helps leading organizations manage complex issues and achieve their mission-critical objectives. I thrive in fast-moving environments that require big thinking, policy chops, teamwork, a global network of high-level contacts, seasoned judgement, and the willingness to go the extra mile to reach success. Currently President of Rally International Public Relations. Serve as an Advisor to Laurel Strategies, a Washington DC-based global

9

reputation management advisory firm, and Pegasus Capital Advisors, a private equity firm specialized in sustainable investing. The longtime partner of former Beatles manager Peter Brown, I helped build a successful mid-sized global public relations and public affairs firm that consistently achieved success in high-stakes, win-lose engagements in sports, entertainment and politics. I have served heads of state across the Caribbean, Panama, Ecuador, Chile, Pakistan, China, Gabon, Morocco, Chile, the DRC, and various Gulf Cooperation Council states. I have helped a number of companies launch IPOs and overcome regulatory and policy hurdles. I have served as a senior executive and advisor to a number of prominent leaders including Disney CEO Michael Eisner, former Federal Reserve Chairman Paul A. Volcker, SONY CEO Sir Howard Stringer, NASDAQ CEO Bob Greifeld, Bono, Blackstone Group founder Peter G Peterson, NBC Universal Chairman Bob Wright, among others. I led winning PR campaigns on behalf of two Olympic Bid city candidates (Beijing 2008 and Vancouver 2010), and a successful FIFA World Cup host nation. I led a turnaround in ticket sales and hotel stays at one of America's most beloved tourist attractions, and I have won nearly every major industry award conferred by the public relations industry, including being named "Global PR Person of the Year" by PR Week Magazine. I am a foreign policy expert who served as an Advisor in two US presidential Administrations and was Director of Public Affairs at The Council on Foreign Relations. I have managed very sensitive issues and crises for The Federal Emergency Management Agency. I am also an artist, musician, and author of critically-acclaimed fiction.

https://www.linkedin.com/in/michael-scott-holtzman/

Mr. Holtzman was brought into the alleged conspiracy through Renata Parras. He had the public relation skills to assist in publicly promoting the new democratic government once it was installed. Mr. Holtzman conveyed to other co-conspirators that he was instrumental in doing this type of work previously in the country of Gabon. He alluded to the other co-conspirators that he worked for, or closely with, the Central Intelligence Agency and that his participation in the plan would be essential to United States government support moving forward after installation of a new government in South Sudan. Mr. Holtzman attended meetings of the co-conspirators and was also provided a copy of the PowerPoint presentation laying out the plan. Mr. Holtzman even received payment, as arranged by Mr. Kasparov, for his essential contributions to the alleged conspiracy. To date, Mr. Holtzman remains an unindicted co-conspirator. Mr. Holtzman, unlike defendants, is not black.

The Superseding Indictment in this matter should be dismissed because it violates defendants constitutional rights as guaranteed by the Equal Protection Component of the Due Process Clause of the Fifth Amendment to the United States Constitution. The summary above of the unindicted co-conspirators' participation is not exhaustive. It is a small sampling of their conduct and it demonstrates the necessity of each person to the conspiracy that forms the allegations against only defendants Ajak and Keech. This sampling shows that Mr. Ajak and Mr. Keech are not the only ones that could have or should have been indicted in this case. Yet, to the exclusion of the other named co-conspirators, they were.

The government's decision to only charge the black defendants establishes the discriminatory effect required in a selective prosecution claim. "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals from a different race were not prosecuted." *Armstrong*, 517 U.S at 465, *citing Ah Sin v. Whittman,* 198 U.S. 500 (1905). That is precisely what took place in this case. Each of the individuals named in this Motion were necessary and integral parts of the alleged conspiracy. Each of the individuals knew the objective of the alleged conspiracy and willingly took actions to further that objective. Indeed, the alleged conspiracy was impossible without the actions of those individuals. They are "similarly situated individuals" to Mr. Ajak and Keech and are each a different race than the defendants.

Discriminatory effects of selective prosecution claims can also rest on "other arbitrary classifications." *Armstrong*, 517 U.S at 464. Here, in addition to race, the discriminatory effect requirement is shown by another arbitrary classification. The unindicted co-conspirators in this case belong to a political and socioeconomic class that defendants do not belong to. Indictments of the non-black co-conspirators in this matter would create political and economic shockwaves that could affect U.S. foreign policy and world financial markets. As such, upon a close examination of the co-

11

conspirators, it becomes apparent that Mr. Ajak and Mr. Keech are arbitrarily expendable, unlike the other similarly situated co-conspirators. Indictment of Mr. Ajak and Mr. Keech has not shut down financial markets or caused any ▮▮▮▮▮ to collapse from uncertainty. Nor has their indictment caused United States foreign policy to come under scrutiny or expose secrets of any number of government agencies. All of which and more would become a real possibility should the above-named co-conspirators be indicted. The choice to indict Mr. Ajak and Mr. Keech, who do not belong to the same class of political and socio-economic importance as the other co-conspirators, has created the discriminatory effect necessary to establish a selective prosecution claim because it amounts to "a practical denial" of equal protection under the law. *Yick Wo v. Hopkins,* 118 U.S. 356, 373 (1886).

The second requirement of a successful selective prosecution claim—discriminatory purpose—also exists in this case. It is difficult to determine the motivation of the executive branch when deciding who and what to criminally charge. The executive branch has broad discretion to enforce criminal laws and "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *Armstrong*, 517 U.S at 464. However, here that presumption is overcome by the undeniable and overwhelming discriminatory effect of the charging decision. Black defendants were charged and similarly situated white co-conspirators were not. Politically and socio-economically unimportant black defendants were charged when similarly situated *but* politically and socioeconomically important white co-conspirators were not. "The goal of identifying a similarly situated class of law breakers is to isolate the factor allegedly subject to impermissible discrimination. The similarly situated group is the control group." *United States v. Wilson,* 123 F.4th 1021, 1027 (2024). Here, the defendants are the same in all relevant aspects with members of the control group except for the isolated factor of their skin color. A class protected by

the Fifth Amendment. "If all other things are equal, the prosecution of only those persons exercising their constitutional rights gives rise to an inference of discrimination." *Id.* at 1028. Just as the *Wilson* court found that the exercise of a constitutional right gives rise to an inference of discrimination, this court too can draw a reasonable inference that the charging decision was motivated by an impermissible discriminatory purpose. As such, the Superseding Indictment in this matter should be dismissed as it violates the Equal Protection Component of the Due Process Clause of the Fifth Amendment to the United States Constitution.

Should this Court find there is not "clear evidence" of discriminatory purpose, Mr. Ajak moves in the alternative for an order to obtain discovery on this issue. In interpreting federal rules, the United States Supreme Court has held that because a selective prosecution claim is not a defense to the merits of a criminal charge but instead is an independent claim of prosecutorial misconduct, discovery related to selective prosecution allegations will be granted only if defendants first demonstrate "some evidence" of discriminatory effect and discriminatory intent. *See United States v. Armstrong*, 517 U.S. 456, 463 (1996); *see also United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam). The *Armstrong* court stated that the "showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." 517 U.S. 456, 464. This creates what some describe as a Catch-22: selective prosecution claimants "cannot even get discovery without evidence, and one can rarely get evidence which will satisfy a court without discovery." Gabriel J. Chin, *Race, the War on Drugs, and the Collateral Consequences of Criminal Conviction,* 6 J. GENDER RACE & JUST. 253, 267 (2002); Kristen E. Kruse, *Comment, Proving Discriminatory Intent in Selective Prosecution Challenges – An Alternative Approach to United States v. Armstrong*, 58 SMU L. REV. 1523, 1534 (2005). While the discovery standard applicable to selective prosecution claims in federal court is rigorous, it is "less stringent" than that required to prove a

selective prosecution claim on the merits. *United States v. James*, 257 F.3d 1173, 1178 (10th Cir. 2001). As one court observed, "defendants need not establish a prima facie case of selective prosecution to obtain discovery on these issues." *Id*.

In some federal criminal cases decided after *Armstrong*, courts have found that defendants presented the requisite "some evidence" of discriminatory effect and intent to satisfy the discovery standard. *See United States v. Jones*, 159 F.3d 969 (6th Cir. 1998) (police officers' custom-made t-shirts celebrating arrest of two Black defendants—but not their White co-defendant—along with postcard sent by police officer to Black defendant awaiting trial featuring Black woman with bananas on her head constituted prima facie evidence of discriminatory intent; referral of Black defendant for federal prosecution of crack cocaine charges combined with failure to refer for federal prosecution eight non-Black defendants who were arrested and prosecuted for crack cocaine charges constituted "some evidence" of discriminatory effect); *United States v. Tuilt*, 68 F. Supp. 2d 4 (D. Mass. 1999) (where Black defendant was federally prosecuted for crack cocaine charges, evidence that no Whites were prosecuted for crack cocaine charges in four federal courts during a time period in which some Whites were prosecuted for crack cocaine charges in state courts in the same area constituted sufficient evidence of discriminatory effect and discriminatory intent for purpose of obtaining discovery).

Here, it is clear Mr. Ajak's claim is not lacking. Only two black defendants were indicted while each white similarly situated co-conspirator was not. At a minimum "some evidence" of discriminatory effect and purpose exists. Enough so for this Court to order discovery on the issue. That discovery to the defense should include, but not be limited to: any prosecution memorandum that was prepared by the Department of Justice or U.S. Attorney's Office for the District of Arizona; all internal emails and work product related to or discussing charges in this case; dates, times and any

written or recorded documentation of meetings where this case and its charges were discussed; any national security material related to unindicted co-conspirators named in this motion; any internal prosecution memorandum, emails, or communications of the Department of Homeland Security relating to suspects and charges in this case; grand jury transcripts; and all other materials or communications in the possession of the government that would make the overall selective prosecution claim more or less likely.

**IV.    CONCLUSION:**

For the reasons stated herein, Defendant Peter Biar Ajak, respectfully requests that the Court grant the Motion to Dismiss the Superseding Indictment for Selective Prosecution in Violation of the Equal Protection Component of the Due Process Clause of the Fifth Amendment, or in the alternative, Motion for Discovery as to Prosecutorial Intent.

Excludable delay under 18 U.S.C. § 3161(h)(1)(D) may result from this motion.

RESPECTFULLY SUBMITTED this 29th day of May 2025.

**KURT M. ALTMAN, P.L.C.**

/s/ Kurt M. Altman
Kurt M. Altman
*Attorney for Defendant*

I hereby certify that on the 29th day of May 2025,
I electronically transmitted the attached
document to the Clerk's Office using the
CM/ECF system for filing and transmittal
of a Notice of Electronic Filing to the
following CM/ECF registrants:

Honorable Steven P. Logan
United States District Court Judge
logan_chambers@azd.uscourts.gov

Amy Chang
Assistant United States Attorney
Amy.Chang@usdoj.gov

Raymond Woo
Assistant United States Attorney
Raymond.Woo@usdoj.gov

M. Bridget Minder
Assistant United States Attorney
Bridget.Minder@usdoj.gov

Richard C. Bock
lingemanbock@qwestoffice.net
Attorney for Defendant Keech

Dominic James Rizzi
Rizzilawaz@gmail.com
Attorney for Defendant Keech

By: */s/ Kurt M. Altman*_____

KURT M. ALTMAN, P.L.C.
12621 N Tatum Blvd., #102
Phoenix, AZ 85032
(602) 689-5100